VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

ENVIRONMENTAL DIVISION
Docket No. 20-ENV-00027



| | |
|---|---|
| Agency of Natural Resources,<br>              Plaintiff<br>                        v.<br>Vorsteveld Farm, LLP,<br>              Respondent | **DECISION ON MOTIONS** |

In the cross-motions for summary judgment before the Court in this enforcement action, the Agency of Natural Resources (ANR or the Agency) requests a judgment in favor of the settlement agreement it negotiated with Vorsteveld Farm, LLC (Respondent) while the Conservation Law Foundation (CLF), as a third-party intervenor, seeks to have it vacated. The settlement agreement is an assurance of discontinuance (AOD) that ANR entered into with Respondent pursuant to 10 V.S.A. § 8007 in resolution of Respondent's violations of two Vermont statutes. CLF has intervened under 10 V.S.A. § 8020 to challenge the penalty amount in the proposed AOD as insufficient to carry out the purposes of the Administrative Environmental Law Enforcement statutes, 10 V.S.A Chapter 201.

The procedural posture of the motions for summary judgment is such that the parties agree to the material facts and have jointly filed a Stipulated Statement of Material Facts (SOMF). As there are no factual disputes, the briefs submitted by CLF and ANR request judgment on the matter of whether the AOD is sufficient to carry out the purposes of 10 V.S.A. Chapter 201. ANR and CLF each filed an initial motion for summary judgment (ANR referred to its motion as a brief in favor of judgment) as well as responsive briefing.

ANR additionally filed a motion to strike CLF's Reply to the Agency's Reply, which CLF filed in response to ANR's memorandum in opposition to CLF's Motion for Summary Judgment. ANR argues that the Court did not authorize CLF to file a reply when it ordered in the March 23, 2021

1

Scheduling Order that "[r]esponses to any pretrial motions shall be filed in accordance with the V.R.C.P." As the Scheduling Order authorizes responses consistent with the V.R.C.P, and V.R.C.P. 56(c)(5) explicitly allows the moving party to "file a reply to a memorandum in opposition within 14 days after service of the memorandum," the Court finds no issue with CLF's Reply. V.R.C.P. 56(c)(5). ANR's motion to strike is **DENIED**.

CLF is represented by Attorney Elana M. Mihaly and Attorney Heather A. Govern, *pro hac vice*. ANR is represented by Attorney Kane Smart. Respondent is represented by Attorney John M. Mazzuchi, and by Attorney Gary H. Baise, *pro hac vice*.

<u>**Background**</u>

Respondent owns and operates a Large Farm Operation in Panton, Vermont, consisting of three facilities on multiple properties in the same general vicinity, and about 1,500 acres of agricultural land bounded to the east by the Dead Creek. ANR and Respondent entered the AOD in late September of 2020 in resolution of the violation of 10 V.S.A. § 1259(a) for the unpermitted discharge of wastes from one of Respondent's facilities to a tributary of the Dead Creek, and two violations of 10 V.S.A § 913(a) and Vermont Wetlands Rules § 9.1 for unpermitted clearing vegetation, dredging, and placing fill in Class II wetlands and buffer zones. ANR discovered one of the wetlands violations in an area near Panton Road in May 2016 (Panton Road Wetland) and the other in June 2017 near Pease Road (Pease Road Wetland). ANR first observed the discharge violation in March 2020.

ANR reached this settlement with Respondent pursuant to 10 V.S.A § 8007, which allows ANR to accept an AOD from a respondent as an alternative to other methods of enforcement such as an Administrative Order (AO). 10 V.S.A. § 80079(a). Under the AOD, Respondent agrees to the facts proving the violations and agrees to perform the actions described in its terms to remediate the impact of the violations. Along with remediation, the AOD also requires Respondent to pay a penalty of $21,750.

ANR filed the AOD with the Court on November 19, 2020 and CLF subsequently moved to intervene under 10 V.S.A. § 8020(c). The Court granted the motion to intervene on January 4, 2021 in an entry order following a hearing that day in which the attorneys discussed the motion.

The scope of CLF's intervention is limited by 10 V.S.A. § 8020(h) to the question of whether the AOD is insufficient to carry out the purposes of the Administrative Environmental Law Enforcement statutes in Chapter 201.

**Stipulated Statement of Material Facts**

CLF, ANR, and Respondent submitted the following facts in a Stipulated Statement of Material Facts on April 30, 2021 pursuant to the Court's March 23, 2021 Scheduling Order:

1) On April 27, 2020, the Agency sent Respondent a letter stating that it had "information that Vorsteveld Farm, LLP, has violated two Vermont statutes in the operation of the Vorsteveld Farm in Panton" and "concluded that enforcement was warranted." [**Exh. 1**, ANR Enforcement Letter to Vorstevelds (Apr. 27, 2020)]

2) In late September 2020, the Agency and Respondent entered into an Assurance of Discontinuance (AOD) in order "to resolve all outstanding disputes" concerning the alleged violations. The AOD was signed by Respondent on September 21, 2020, and by the Agency on September 29, 2020. The AOD was filed with this Court on November 19, 2020. [**Exh. 2**, Assurance of Discontinuance]

3) The Parties hereby incorporate Paragraphs 1 – 17 of the Statement of Facts and Description of Violation as well as Paragraphs B – L of the Agreement Section in the AOD. [**Exh. 2**]

4) The AOD requires that Respondent "pay a total penalty of $21,750" for the alleged violations. [**Exh. 2** at ¶ A].

5) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist, Wetlands Program, and Christopher Gianfagna, Manager, Concentrated Animal Feeding Operation Program, both stated "We determined the $21,750 penalty in the settlement agreement by considering the statutory criteria found in 10 V.S.A. § 8010 and the Environmental Administrative Penalty Rules, using our expertise in our respective scientific fields and our experience in our respective Programs within the Agency…. Throughout the process, we also considered privileged legal advice concerning historical Agency practice, general principles of fairness and justice, and litigation risks and settlement benefits as they relate to the Environmental Division's *de novo* review of an AO to be pursued in lieu of an AOD, including the quality of evidence and existing judicial precedent. If a respondent appeals an AO, the Court will independently determine a penalty based on the evidence presented at trial. The risks of pursuing an AO that results in an unfavorable decision from the Court and the establishment of adverse judicial precedent are weighed against the benefits of settlement and entering an

AOD, including certainty, finality, and prompt environmental remediation." [**Exh. 3**, Response to Q.APPELLANTS:ANR.1]

6) For purposes of settlement, a $6,750 penalty was assessed for the discharge to the tributary of the Dead Creek, and a $15,000 penalty was assessed for the activities in the Panton Road and Pease Road Wetlands. [*See* **Exh. 16**, Response to Q.APPELLANTS:ANR.8]

7) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist, Wetlands Program, states "I determined a single penalty for the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 for the removal of vegetation and placement of fill within portions of the Panton Road Wetland and its 50-foot wetland buffer area in May 2016, and the vegetation removal, dredging, and filling within portions of the Pease Road Wetland and its 50-foot wetland buffer area in June 2017. A single monetary penalty was determined based on the facts and circumstances in this enforcement matter, including the facts that the same landowner was involved in both actions, that similar compliance directives were required for both areas, that the affected wetlands were in the same general vicinity and part of larger wetland complexes, that neither violation resulted in a threat to or actual substantial harm to the environment or public health, and that the Agency notified the Respondent of both violations through the same notice of alleged violation with the same compliance directives. My determination here is consistent with the approach the Wetlands Program has taken in prior enforcement matters." [**Exh. 4**, Response to Q.APPELLANTS:ANR.2]

8) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist, Wetlands Program, states "Grouping violations together when calculating penalties is done on a case-by-case basis because it depends on the facts and circumstances surrounding the particular enforcement matter. Under 10 V.S.A. § 8010(c)(1), the decision to assess a separate penalty for each violation is discretionary. It states that a penalty "may be assessed for each determination of a separate violation." [**Exh. 5**, Response to Q.APPELLANTS:ANR.15]

9) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist, Wetlands Program, states: "For purposes of settlement, I classified Respondent's removal of vegetation, placement of fill, and dredging within portions of the Panton Road Wetland and Pease Road Wetland and their 50-foot wetland buffer areas as Class II violations because they involve activities initiated before the issuance of all necessary environmental permits, and they neither caused substantial harm nor presented a threat of substantial harm to the environment or public health. The determination was based on the fact that Respondent's activities in the affected wetlands trigger jurisdiction and require a

permit. Under Vermont Wetland Rules § 9.1, any activity that is not an exempt or allowed use occurring within a Class II wetland or its buffer requires a wetland permit. The determination was also based on the facts and circumstances of this enforcement matter relating to the potential harm to the environment and public health, including the wetland characteristics like soil and vegetation type; the size, extent, and degree of the disturbance within the wetlands; the relationship between the affected wetlands and the larger wetlands complex; the effect of the disturbance on the functions and values of the wetlands and the larger wetlands complex, the historical uses of the wetlands and the surrounding areas; and the likelihood of successful wetland restoration. My determination here is consistent with the approach the Wetlands Program has taken in prior enforcement matters." [**Exh. 6**, Response to Q.APPELLANTS:ANR.4]

10) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager, Concentrated Animal Feeding Operation Program, states: "For purposes of settlement, I classified the discharge of wastes from the Main Farm facility through the roadside channel to the tributary of the Dead Creek as a Class II violation because the violation is more than a minor violation of the statute. Early in the evaluation of the facts and circumstances surrounding the discharge, I initially classified the violation as a Class I violation based on the threat of substantial harm to the environment; however, after further evaluation of the evidence and more familiarity with the facility and discharge—and in order to be consistent with the classification in recent AODs of Section 1259(a) violations involving similar facts and circumstances, including similar waste streams—I decided it was more appropriate to consider the violation as a Class II violation. The determination was based on the facts and circumstances of this enforcement matter, including the constituents of the discharge and their relative contribution; that is, the characteristics of the discharge, like strength of the waste material, flow rate, frequency, and timing; as well as the degree of impact on receiving waters, including impacts to aquatic life and habitat." [**Exh. 6**, Response to Q.APPELLANTS:ANR.4]

11) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist in the Wetlands Program, states "[f]or purposes of settlement, I assigned a score of 8 to the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1, broken down as follows:
   (a) Public Health: 1 – The violations had a minor actual impact on public health, safety, and welfare because of the aesthetic impact of tree removal at the Pease Road wetland. The violations had a minor potential impact on public health, safety, and welfare because of the risk of reduced flood storage capacity at the Panton Road wetland.
   (b) Environment: 3 – The violations had a major actual impact on the environment because the vegetation removal, fill, and excavation resulted in diminished function of more than 6 acres of wetlands at Panton Road.

(c) Knowledge: 1 – Respondent had reason to know about the violated legal requirement because 10 V.S.A. § 913(a) and the Vermont Wetland Rules § 9.1 are freely available to the public. There is clear evidence Respondent knew the facts of the violation existed at the Pease Road Wetland because prior to the activities, Respondent possessed a map from NRC showing the presence of the Pease Road Wetland. The lower score pertains to knowledge of the legal requirement (1 vs 3).

(d) Compliance History: 0 – Respondent had no prior violations because no final judicial orders concerning the Agency rules, regulations, or statutes were issued against Respondent in the last 7 years.

(e) Duration: 3 – The violations were of long duration because they existed more than 1 year.

My determinations here are consistent with the approach the Wetlands Program has taken in prior enforcement matters." [**Exh. 7**, Response to Q.APPELLANTS:ANR.5]

12) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist in the Wetlands Program, states "After considering Section 20-302(b) and (c) [of the Administrative Penalty Rules], I determined a base penalty of $12,000 for the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1. I adjusted the base penalty to $30,000 under Section 20-302(c)(2)(A) [of the Administrative Penalty Rules] because the degree of actual or potential environment impact resulted in a score of 3." [**Exh. 8**, Response to Q.APPELLANTS:ANR.6]

13) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist in the Wetlands Program, states that "For purposes of settlement, I did not consider the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 to be a "continuing" violation. Considering a violation "continuing" is done on a case-by-case basis because it depends on the facts and circumstances surrounding the particular enforcement matter. Under 10 V.S.A. § 8010(c)(1) and Section 20-105 of the Administrative Penalty Rules, the decision to consider a violation "continuing" is discretionary. I "may consider any violation [that meets the criteria] as a continuing violation." In exercising this discretion, I decided not to classify the violation as "continuing" after considering many factors, including that the penalty in the AOD was sufficient to carry out the purposes of 10 V.S.A. § 8001 without "additional penalties for each day" of the violations. I also considered whether Respondent's actions had discrete endpoints, if there was a measurable or discernable additional harm on each consecutive day, and whether the Agency had interactions with the Respondent during the period in question. Other considerations involved whether the penalty attributable to a continuing violation would exceed the Agency's statutory cap or be disproportionate to the nature of the violation. My approach is consistent with

the approach the Wetlands Program has taken in prior enforcement matters involving similar circumstances." [**Exh. 9**, Response to Q.APPELLANTS:ANR.3]

14) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager in the Concentrated Animal Feeding Operation Program, states that "[f]or purposes of settlement, I assessed a score of 5 to the violation of 10 V.S.A. § 1259(a), broken down as follows:

   (a) Public Health: 0 – The violation had a minor potential impact on public health, safety, and welfare because of the relatively low risk of contact recreation and drinking water contamination.
   (b) Environment: 1 – The violation had a moderate potential impact on the environment because of the potential impact of specific pollutants entering state waters.
   (c) Knowledge: 1 – The Respondent had reason to know about the violated legal requirement because 10 V.S.A. § 1259(a) is freely available to the public and the respondent is engaged in a regulated activity. Respondent should have reasonably known the facts of the violation on May 8, 2019, because Respondent works in the area where the source and pathway of pollutant-laden runoff is observable.
   (d) Compliance History: 0 – Respondent had no prior violations because no final judicial orders concerning Agency rules, regulations, or statutes were issued against Respondent in the last 7 years.
   (e) Duration: 3 – The violation was of a long duration because it existed on May 8, 2019, and I observed evidence of similar issues in March of 2020.

   My determinations here are consistent with the approach the CAFO Program has taken in prior enforcement matters." [**Exh. 7**, Response to Q.APPELLANTS:ANR.5]

15) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager in the Concentrated Animal Feeding Operation Program, states "After considering Section 20-302(b) and (c) [of the Administrative Penalty Rules], I determined a base penalty of $9,000 for the violation of 10 V.S.A. § 1259(a)." [**Exh. 8**, Response to Q.APPELLANTS:ANR.6]

16) The Agency of Agriculture, Food & Markets sent a Corrective Action Warning Letter (CAL) to Respondent on April 9, 2018, for failure to properly operate and maintain two clean water diversion ditches located to the south and north of the Main Back and Far Back manure pits. The CAL provides notice that the Vorstevelds violated their Large Farm Operation (LFO) Permit LFO#2014-02-A2, the LFO Rule, and the Required Agricultural Practices Regulations (RAPs). The CAL does not mention 10 V.S.A. § 1259(a) or the Agency of Natural Resources. [Exh. 10, AAFM, Corrective Action Warning Letter (April 9, 2018)]

17) The Agency of Agriculture, Food & Markets sent a Corrective Action Warning Letter (CAL) to Respondent on November 15, 2019, for failure to properly operate and maintain the clean water diversion ditches on the Main Farm on May 8, 2019. The CAL provides notice that the Vorstevelds violated their Large Farm Operation (LFO) Permit LFO#2014-02-A2 and the Required Agricultural Practices (RAP) Rule. The CAL does not mention 10 V.S.A. § 1259(a). [Exh. 11, AAFM, Corrective Action Warning Letter (November 15, 2019)]

18) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager in the Concentrated Animal Feeding Operation Program, states that "For purposes of settlement, I did not consider the violation of 10 V.S.A. § 1259(a) to be a "continuing" violation. Considering a violation "continuing" is done on a case-by-case basis because it depends on the facts and circumstances surrounding the particular enforcement matter. Under 10 V.S.A. § 8010(c)(1) and Section 20-105 of the Administrative Penalty Rules, the decision to consider a violation "continuing" is discretionary. I "may consider any violation [that meets the criteria] as a continuing violation." In exercising this discretion, I decided not to classify the violation as "continuing" after considering many factors, including that the penalty in the AOD was sufficient to carry out the purposes of 10 V.S.A. § 8001 without "additional penalties for each day" of the violations. In addition, the precipitation-driven discharge from the Main Farm facility through the roadside channel to the tributary of the Dead Creek did not exhibit the characteristics of a continuing violation. My approach is consistent with the approach the CAFO Program has taken in prior enforcement matters." [**Exh. 9**, Response to Q.APPELLANTS:ANR.3]

19) When the Agency completed the Administrative Penalty Form on March 24, 2020, the Agency identified a potential economic benefit associated with the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 that included "conversion to cropland increases yield + supply for sale: sale of timber removed." The Agency did not attribute a monetary amount to this activity, but "reserved" this for a later determination. [Administrative Penalty Calculation for the Wetlands Violation, **Exh. 12**]

20) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist in the Wetlands Program, states "For purposes of settlement, I did not increase the $30,000 adjusted base penalty for the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 to reflect an economic benefit realized by Respondent because Respondent will incur costs restoring the areas and remediating the impact—costs that are likely greater than the cost of obtaining a permit or avoiding impacts in the first place—such as the labor costs associated with the additional time needed for a consultant to develop the site and restoration plans, labor costs to remove and dispose of fill, cost of replanting vegetation, and costs of ongoing monitoring. The economic benefit for

Respondent's temporary use of the disturbed areas is difficult to accurately calculate, and likely marginal due to the insignificant increase in production area. Any profit from a potential sale of timber is similarly difficult to accurately estimate and likely negligible. The significant costs to bring the site into compliance—including removing the fill, replanting vegetation, and monitoring for three years—will more than likely offset any avoided costs or financial gains. Nor did I increase the $30,000 adjusted base penalty to reflect the state's costs of enforcement related to the violation because the costs of enforcement do not materially accrue unless the case proceeds to litigation, and the costs of my time investigating the violation and participating in negotiations are relatively modest and overshadowed by the benefits of prompt settlement. Not including costs of enforcement in an AOD is consistent with the approach the Wetlands Program has taken in prior enforcement matters" [**Exh. 13**, Response to Q.APPELLANTS:ANR.7]

21) In response to written discovery propounded by CLF, Respondent stated that "Respondent's activities near Panton Road resulted in Respondent gaining the use of two to three additional acres of crop land from 2016 to present, and Respondent has made no use of the Pease Road Wetland." Respondent also stated that "its costs to remediate the alleged wetlands violations under Paragraph C of the AOD will dramatically outweigh any minor economic benefit Respondent may have derived from the alleged violations." [**Exh. 14**, Vorsteveld Farm, LLP's Response #6 to Conservation Law Foundation's First Set of Requests for Production]

22) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist in the Wetlands Program, states, "For purposes of settlement, I did not increase for deterrent effect the $30,000 adjusted base penalty for the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 because—in light of the cost of compliance directives in the AOD, the lack of prior Agency enforcement actions against Respondent, and the effect of the enforcement action on Respondent's behavior—I did not think that increasing the penalty was reasonably necessary to deter Respondent or the regulated community from future violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1." [**Exh. 15**, Response to Q.APPELLANTS:ANR.9]

23) In response to written discovery propounded by CLF, Zapata Courage, District Wetlands Ecologist in the Wetlands Program, states: "For purposes of settlement, I reduced the $30,000 adjusted base penalty for the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 in consideration of the Agency's delay in initiating enforcement and Respondent's willingness to enter into a settlement agreement. I reduced the $30,000 adjusted base penalty by a total of 50%. It is standard for the Wetlands Program to consider settlement a mitigating circumstance that warrants a 25% reduction in based [*sic*] penalty. The further reduction was based on a reasonable valuation of delayed enforcement as a

mitigating circumstance. I think it is reasonable to anticipate that the Court could find undue delay based on the evidence presented at trial, and that the Court could reduce the penalty by at least 25%. Although Respondent did take relatively prompt action in response to formal Agency enforcement—including hiring consultants to initiate the compliance effort on the schedule in the AOD—Respondent's efforts did not warrant a further reduction in the penalty." [**Exh. 16**, Response to Q.APPELLANTS:ANR.8]

24) During the time period from the Agency's discovery of the Pease Road Wetland violation in June 2017 and Panton Road Wetland violation in May 2016 and the initiation of a formal enforcement action in April 2020, the Agency conducted investigations into both violations and  communicated with the Agency of Agriculture, Food & Markets in 2017, sent a Notice of Alleged Violation in July 2017, gave the Respondent additional time to complete restoration so that Respondent could harvest crops in fall 2017, and sent registered mail in spring of 2018 that was later returned. No further attempt at delivery was made and enforcement was not pursued. Discussions on next steps went to Agency leadership. [**Exh. 17**, Email from Laura Lapierre to Kim Greenwood, December 3, 2019]

25) On December 30, 2019, Zapata Courage emailed Agency leadership before initiating formal enforcement, identifying some options for moving forward and stating that "outside perception would be that DEC did not consider this a priority" because "DEC was silent for 1 year when [the] violation first came to light, then went silent again for another year." [**Exh. 18**, Email from Zapata Courage to Emily Boedecker and Kim Greenwood (Dec. 30, 2019)]

26) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager in the Concentrated Animal Feeding Operation Program, states: "For purposes of settlement, I did not increase the $9,000 base penalty for the violation of 10 V.S.A. § 1259(a) to reflect an economic benefit realized by Respondent because Respondent's avoided costs of capturing and managing the waste are difficult to accurately estimate, and Respondent actually incurred costs installing structural improvements to eliminate the discharge. There was insufficient evidence to make a reasonable approximation of any gain, profit, or delayed/avoided cost, much of which would likely be offset by the costs of returning to compliance. Nor did I increase the $9,000 base penalty to reflect the state's costs of enforcement related to the violation because the costs of enforcement do not materially accrue unless the case proceeds to litigation, and the costs of my time investigating the violation and participating in negotiations are relatively modest and overshadowed by the benefits of prompt settlement. Not including costs of enforcement in an AOD is consistent with the approach the CAFO Program has taken in prior enforcement matters." [**Exh. 13**, Response to Q.APPELLANTS:ANR.7]

27) In response to written discovery propounded by CLF, Respondent stated that "the alleged unpermitted discharge did not result in an economic benefit to Respondent. Respondent was not required to change its typical operations at its Jersey Street facility in order to cure the problems identified in the AOD, nor was Respondent saving any significant sum of money by not addressing the conditions which allegedly led to an unpermitted discharge sooner." [**Exh. 14**, Vorsteveld Farm, LLP's Response #6 to Conservation Law Foundation's First Set of Requests for Production]

28) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager in the Concentrated Animal Feeding Operation Program,  states: "For purposes of settlement, I did not increase for deterrent effect the $9,000 base penalty for the violation of 10 V.S.A. § 1259(a) because—in light of the compliance directives in the AOD, the lack of prior Agency enforcement actions against Respondent, and Respondent's promptness in taking remedial action, and candor and cooperation in resolving the issues—I did not think that increasing the penalty was reasonably necessary to deter Respondent or the regulated community from future violations of 10 V.S.A. § 1259(a)." [**Exh. 15**, Response to Q.APPELLANTS:ANR.9]

29) In response to written discovery propounded by CLF, Christopher Gianfagna, Manager in the Concentrated Animal Feeding Operation Program, states: "For purposes of settlement, I reduced the $9,000 base penalty for the violation of 10 V.S.A. § 1259(a) in consideration of Respondent's willingness to enter into a settlement agreement. I reduced the base penalty by 25%. It is standard for the CAFO Program to consider settlement a mitigating circumstance that warrants a 25% reduction in based [*sic*] penalty. Although Respondent did take relatively prompt action to address the discharge after the Agency gave notice of the violation, Respondent's response did not warrant a further reduction in the penalty." [**Exh. 16**, Response to Q.APPELLANTS:ANR.8]

30) On August 13, 2020, the Agency received a complaint from a member of the public about the installation of tile drains and tile drain outfalls in fields near Dead Creek and on the north side of Panton Road. [**Exh. 19**, Email from Ethan Swift to Zapata Courage (Aug. 14, 2020)]

31) After completing an investigation in response to the August 13, 2020 complaint, on January 14, 2021, the Agency sent a Notice of Alleged Violation (NOAV) to the Respondent to put Respondent on notice that the Agency "believes that [Respondent is] in violation of the Vermont Wetland Rules within the fields west of and adjacent to Dead Creek, north side of Panton Road" for "[e]xcavating and/or filling of a Class II wetland or buffer for the tile drain outfalls without a wetland permit in violation of the VWR." [**Exh. 20**, Notice of Alleged Violation, Panton Road, Panton – Wetland Project 2020-555]

32) On October 5, 2020, an employee of the Vermont Department of Fish & Wildlife notified Zapata Courage that the Respondent "tiled their field and drained it into Dead Creek. As part of that process they destroyed one of our fences and dug onto our property. Also, they dug trenches in the wetland and cut a lot of trees in the buffer." [**Exh. 21**, Email from Amy Alfieri to Zapata Courage (Oct. 5, 2020)]

33) On November 5, 2020, Catherine Gjessing, General Counsel for the Vermont Department of Fish and Wildlife, sent a letter to the Vorstevelds stating that "On August 24th Department staff observed that tile drains were being installed on fields on your property, abutting Fish and Wildlife land in the town of Panton. Two tile pipe outlets appear to be on Department land and a third is obviously on Department land as it was installed several feet beyond the boundary fence." The letter made no mention of any wetlands. [**Exh. 22**, Letter from Catherine Gjessing to Respondent (Nov. 5, 2020)]

34) On January 11, 2021, Catherine Gjessing, General Counsel for the Vermont Department of Fish and Wildlife, wrote an email to Gerard and Hans Vorsteveld regarding the placement of one of the tile drains, stating that "It has come to my attention that there are a number of wetlands in the area and that the encroachment may also be a violation of the wetland rules." The email directed the Vorstevelds to coordinate with Zapata Courage to ensure that the removal of the tile drain was completed in accordance with the Vermont Wetland Rules. [**Exh. 23**, Email from Catherine Gjessing to Respondent (Jan. 11, 2021)]

35) After completing an investigation in response to the October 5, 2020 complaint associated with the Department of Fish and Wildlife' August 24, 2020 observations, on January 14, 2021, the Agency sent a second NOAV to the Respondent to put Respondent on notice that the Agency "believes that [Respondent is] in violation of the Vermont Wetland Rules within the fields west of and adjacent to Dead Creek, south side of South Road and the dam connected to West Road" for "[e]xcavating and/or filling of a Class II wetland or buffer for the tile drain outfalls without a wetland permit in violation of the VWR." [**Exh. 24**, Notice of Alleged Violation, Panton Road, Panton – Wetland Project 2020-666]

36) Other than the Environmental Administrative Penalty Rules, the Agency does not have a written policy, procedure, or guidance on the calculation of environmental administrative penalties. [**Exh. 25**, Responses to RTP.APPELLANTS:ANR.4 and 5]

37) The Administrative Penalty Form does not provide instructions or guidance on how to determine whether a violation is continuous. Under Section 20-105 of the Environmental Administrative Penalty Rules, the Agency "may consider any violation [that meets the criteria] as a continuing violation subject to additional penalties for each day the violation continues." [**Exh. 26**, Administrative Penalty Form and **Exh. 27**, Administrative Penalty Rules]

38) The Administrative Penalty Form does not provide instructions or guidance on how to determine whether a violation caused a minor, moderate, or major potential or actual impact on the environment or public health, safety, and welfare. [**Exh. 26**].

39) The Administrative Penalty Form does not provide instructions or guidance on whether or how to adjust a penalty due to economic benefit or the cost of enforcement. Under Section 20-302(d) of the Environmental Administrative Penalty Rules, the "penalty amount may be increased" to reflect the economic benefit realized by a respondent or by the costs of enforcement related to the violation. [**Exh. 26** and **Exh. 27**]

40) The Administrative Penalty Form does not provide instructions or guidance on whether or how to adjust a penalty due to mitigating circumstances. Under Section 20-302(e) of the Environmental Administrative Penalty Rules, the Agency "may reduce the penalty amount" to account for the presence of mitigating circumstances. It further states that the Agency "may consider" a number of factors in making this determination, including "relevant factors as determined by the Secretary." [**Exh. 26** and **Exh. 27**]

41) The Administrative Penalty Form does not provide instructions or guidance on whether or how to adjust a penalty to deter a respondent and the regulated community from committing this violation, or similar violations, in the future. Under Section 20-302(e) of the Environmental Administrative Penalty Rules, the Agency "may increase the penalty" if "a larger penalty is reasonably necessary" for deterrence. [**Exh. 26** and **Exh. 27**]

42) The Administrative Penalty Form does not provide instructions or guidance on whether or how to adjust a penalty to account for a delay by the Agency in seeking enforcement. "Unreasonable delay by the Secretary in seeking enforcement" is expressly identified in 10 V.S.A. § 8010(b) as a factor that the Agency must consider in determining the amount of the penalty. Under Section 20-302(e) of the Environmental Administrative Penalty Rules, the Agency "may reduce the penalty amount" in consideration of "unreasonable delay by the Secretary in seeking enforcement." [**Exh. 26** and **Exh. 27** ]

### Standard of Review and Applicable Law

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). The nonmoving party "receives the benefit of all reasonable doubts and inferences," but must respond with more than unsupported allegations in order to show that material facts are in dispute. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt.

13

356. For the purposes of the motion, the Court "will accept as true the allegations made in opposition to . . . summary judgment, so long as they are supported by affidavits or other evidentiary material." Id.; Pettersen v. Monahan Safar Ducham, PLLC, 2021 VT 16, ¶ 9.

Review of an assurance of discontinuance (AOD) is narrower in scope than review of an administrative order (AO). In response to a respondent's challenge to an AO for example, the Court will "determine anew the amount of a penalty by applying the criteria set forth in subsections 8010(b) and (c)." 10 V.S.A. § 8012(b)(4). In the event of a challenge to an AOD, "[u]nlike the *de novo* determination the court must make when performing judicial review of an administrative order," the standard is whether the terms are "insufficient to carry out the purposes" of the administrative environmental law enforcement statutes in Chapter 201. Secretary, Vermont Agency of Natural Resources v. Newbury Waste Management Inc., et al., No. E93-042, slip op. at 2 (Vt. Envtl. Ct. July 22, 1994) (Wright, J.), citing 10 V.S.A. § 8007(c); 10 V.S.A. § 8020(h). This difference in standards reinforces the "strong public policy favoring the settlement of disputes without litigation," that courts "should not seek to retain a dispute . . . if the parties to that dispute are able to resolve it." Id. (citing Dutch Hill Inn, Inc. v. Patten, 131 Vt. 187, 192 (1973)) (explaining that "this policy does not limit a court in satisfying itself that any such settlement is just and that its terms are not unconscionable"). When ANR negotiates an AOD, instead of assessing the penalty anew, the Court reviews the terms reached by the parties and vacates an AOD only upon finding it "insufficient."

CLF has a high burden in its opposition to the AOD as an intervenor under 10 V.S.A. § 8020(h). The statute allows third-party intervention in an environmental enforcement action only for the "sole purpose" of proving that the terms of the AOD or other proposed action are "insufficient to carry out the purposes" of Chapter 201. 10 V.S.A. § 8020(h). The Court will only vacate the AOD if CLF establishes by a preponderance of the evidence that it is insufficient in this manner. Id.

The purposes of the environmental enforcement statutes in Chapter 201 are to:

(1) enhance the protection of environmental and human health afforded by existing laws;

(2) prevent the unfair economic advantage obtained by persons who operate in violation of environmental laws;

(3) provide for more even-handed enforcement of environmental laws;

(4) foster greater compliance with environmental laws;

(5) deter repeated violation of environmental laws; and

(6) establish a fair and consistent system for assessing administrative penalties.

10 V.S.A. § 8001.

In furtherance of these purposes, ANR must consider the following factors when assessing a penalty:

(1) the degree of actual or potential impact on public health, safety, welfare, and the environment resulting from the violation;

(2) the presence of mitigating circumstances, including unreasonable delay by the Secretary in seeking enforcement;

(3) whether the respondent knew or had reason to know the violation existed;

(4) the respondent's record of compliance;

(5) [Repealed]

(6) the deterrent effect of the penalty;

(7) the State's actual costs of enforcement; and

(8) the length of time the violation has existed.

10 V.S.A. § 8010(b)(1) – (8).  See also, 10 V.S.A. § 8010(c)(1) – (2) (restricting the the maximum penalty for each violation to $42,500 plus up to $17,000 for each day a violation continues, and allowing the state to "recapture economic benefit" up to a combined total maximum of $170,000).

ANR's Administrative Penalty Form, attached as Exhibit 26 to CLF's motion, provides a procedure for assessing penalties based on these penalty factors.  Natural Resources Board v. The Stratton Corp., No. 106-7-14 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Nov. 17, 2015) (describing form as an "effort to standardize penalties and ensure a fair process").  ANR's penalty assessments must also conform to the Environmental Administrative Penalty Rules (Penalty Rules), attached as Exhibit 27 to CLF's motion.  Secretary, Vermont Agency of Natural Resources

v. Supeno, No. 98-8-15 VTEC, 2017 WL 876153, at *6 (Vt.Super. Feb. 14, 2017) ("ANR is bound both by 10 V.S.A. § 8010 and their own rules, called the Environmental Administrative Penalty Rules").

CLF's task of establishing that the AOD is insufficient to meet these purposes will require overcoming the discretion ANR has in assessing penalties. Beyond requiring ANR to consider the factors listed in § 8010(b) and stay below the maximums set in § 8010(c), the statutes in Chapter 201 give ANR significant room to determine an appropriate remedy for a violation. See e.g., 10 V.S.A. § 8003(a) ("Secretary *may* take action under this chapter") (emphasis added); 10 V.S.A. § 8007(b)(4) (specifying that an AOD "may" include monetary penalties); 10 V.S.A § 8010(c)(1) – (2) (ANR "may" assess a penalty for each day of a continuing violation and "may" recapture economic benefit). The Administrative Penalty Form provides a procedure to follow when considering the statutory penalty factors but does not specifically instruct the ANR on how to adjust penalties based on those factors, and neither do the Penalty Rules. Stipulated Statement of Material Facts (SOMF) ¶ 36 – 42. Where there are no directives, ANR has discretion to decide how and whether to weigh the factors and adjust penalties as it finds appropriate depending on the circumstances of each case. This discretion matters less under *de novo* review, but it is preserved on review of an AOD. The environmental enforcement statues and the Penalty Rules allow ANR to exercise significant discretion in its determination as to the appropriate penalties for the violations at issue, and those penalties survive review unless shown to be insufficient.

**Analysis**

CLF identifies four areas of insufficiency in support of its request that the Court vacate the AOD: 1) ANR's failure to increase the penalty for the purpose of deterrence; 2) the inconsistency of the AOD when compared to prior determinations, specifically with regard to whether violations are grouped together for the purposes of assessing penalties and whether they are treated as continuous; 3) ANR's economic benefit analysis; and 4) penalty mitigation due to ANR's delay in enforcement.

*Deterrence*

Starting with the issue of deterrence, CLF argues that the $21,750 penalty amount is insufficient to further Chapter 201's goal of deterring repeated violations of environmental laws. 10 V.S.A. § 8001(5). Chapter 201's deterrence purpose corresponds with § 8010(b)(6) of the penalty factors that ANR must consider when assessing a penalty. 10 V.S.A. § 8010(b)(6) (ANR "shall consider . . . the deterrent effect of the penalty"). Deterrence is incorporated into the Administrative Penalty Form based on these penalty factors and on the Agency's Penalty Rules in two ways. A respondent's "record of compliance with the statutes specified in 10 V.S.A. Section 8003 or related rules, permits, orders, or assurances of discontinuance in the seven years preceding the violation" receives a score of 0 – 3 that corresponds to the number of prior violations, and the form also allows ANR to increase the initial penalty amount if "reasonably necessary" to deter "this violation, or similar violations, in the future." Exh. 26, Administrative Penalty Form. The language in the Administrative Penalty Form mirrors that in ANR's Penalty Rules, which instructs ANR to consider compliance history that is relevant to the statutes specified in 10 V.S.A. § 8003 and which gives ANR the option of adjusting the penalty for the purposes of deterrence but does not require it. Exh. 27, Penalty Rules §§ 20-302(b)(4), (e)(2).

CLF challenges ANR's assessment of Respondent's compliance history, citing alleged violations and violations issued by other state agencies that ANR did not incorporate into its Administrative Penalty Form calculation. Specifically, CLF asserts that ANR should have increased the penalty for the purpose of deterrence because Respondent allegedly violated wetland regulations on August 13, 2020 and August 24, 2020 with activity related to tile drain installation while parties were negotiating the terms of the AOD. SOMF ¶¶ 30 – 35. CLF also cites to the Corrective Action Warning Letters that Respondent received on April 9, 2018 and November 15, 2019 from the Agency of Agriculture, Food & Markets (AAFM) for violations related to Respondent's Large Farm Operation (LFO) Permit, the LFO Rule, and the Required Agricultural Practices Regulations. SOMF ¶¶ 16, 17.

Finding no final judicial orders concerning Agency rules, regulations, or statutes issued to Respondent in the last seven years, ANR calculated a severity rating in the Administrative Penalty Form for Respondent's violations without adding points for prior violations. SOMF ¶¶ 11, 14.

Neither the alleged August 2020 violations nor the violations related to the LFO permit fall inside the scope of prior violations the Penalty Rules instruct ANR to consider. The Corrective Action Warning Letters sent by AAFM do not relate to the statutes specified in 10 V.S.A § 8003, and the alleged violations have not yet been shown to be violations. ANR sent two Notice of Alleged Violation (NOAV) letters to Respondent in January 2021 but has yet to initiate formal enforcement. See SOMF ¶¶ 31, 35. Further, the parties had not yet entered into the AOD when Respondent allegedly committed the violations in August of 2020. SOMF ¶ 2 (parties entered into the AOD in the end of September 2020). ANR acted within its discretion in determining that it was not necessary to increase the penalty amount for the purposes of deterrence when Respondent had no prior history of noncompliance with ANR rules and the alleged violations occurred before the terms of the AOD had been settled and could be expected to deter.

The Court is not persuaded by CLF's argument that the AOD is insufficient to deter repeated violations in the absence of an additional penalty increase. ANR considered the deterrent effect of the AOD as a whole, the $21,750 penalty amount and the accompanying cost of the compliance directives, and determined that it was sufficient to deter repeated violations without an additional increase. SOMF ¶¶ 22, 28. In addition to the penalty, Respondent will incur significant costs to come back into compliance such as paying a consultant to develop site and restoration plans, and paying the labor costs of removing the fill, replanting vegetation, and monitoring the site for three years. SOMF ¶ 20. Our determination that the AOD provides sufficient deterrence is bolstered by Respondent's cooperation with ANR. Respondent took prompt remedial action to address the violation of 10 V.S.A. § 1259(a) in response to the NOAV, and has taken steps toward restoration in response to the formal enforcement of the violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1. SOMF ¶ 22 – 24, 29. CLF has not shown a preponderance of the evidence that the AOD is insufficient to carry out the purpose of deterrence.

*Consistency in Enforcement*

CLF also takes issue with the way ANR assessed a single penalty for the violations of 10 V.S.A § 913(a) in the AOD, and the way ANR did not classify all three violations as continuing violations subject to penalties per day of violation. Arguing that these approaches diverge from

18

previous penalty assessments, CLF asserts that such inconsistencies are insufficient to support an even-handed, fair, and consistent system for assessing administrative penalties. 10 V.S.A. § 8001(3), (6).

ANR assessed a single penalty of $15,000 for both the Panton Road and Pease Road Wetlands violations of 10 V.S.A. § 913(a) and Vermont Wetland Rules § 9.1 in the AOD. SOMF ¶ 6. Respondent's violative activities included the removal of vegetation and placement of fill within portions of the Panton Road Wetland and it's 50-foot wetland buffer area in May 2016, and vegetation removal, dredging, and filling within portions of the Pease Road Wetland and its 50-foot wetland buffer area in June 2017. SOMF ¶ 7. ANR decided to group the two wetland violations because they both involved the same landowner, required similar compliance directives, and though they were not on the same site, they were in the same general vicinity, being less than three miles away from each other and part of larger wetland complexes. SOMF ¶¶ 3, 7. Additionally, ANR notified Respondent of both violations in the same NOAV and found that neither violation resulted in a substantial harm or a substantial threat of harm to the environment or public health. SOMF ¶¶ 7, 9.

CLF argues that ANR based its decision to group the wetland violations on factors that are not the ones this Court and ANR have previously used. We note that ANR's decision of whether to assess a separate penalty for each violation is discretionary. Under 10 V.S.A. § 8010(c)(1), ANR "may" assess a penalty up to the maximum "for each determination of a separate violation." The Court has recognized ANR's discretion in this capacity, explaining that ANR "has discretion to calculate and assess one penalty for events that result in more than one violation or to calculate and assess a separate penalty for each violation stemming from the same activity." Agency of Natural Resources v. Tobin, No. 94-8-18 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Mar. 14, 2019) (Walsh, J.). Searching for requirements in the absence of statutory or administrative ones, CLF cites to a number of cases in which the Court decided whether to assess separate penalties in an AO depending on the fact-specific relationship between the violations. The cases do not limit the specific circumstances under which ANR can decide to group penalties. Furthermore, the discretionary decisions the Court makes in its *de novo* review of an AO may serve as guidance, but do not control ANR's own exercise of discretion in negotiating an AOD. ANR decided not to

assess separate penalties for the two wetland violations in this matter based on the facts of the relationship between the violations, and it is undisputed that this determination is consistent with the approach it has taken in prior enforcement matters. SOMF ¶¶ 7, 9, 11.

CLF also argues that because all three violations meet the criteria in the Penalty Rules for classification as continuing violations, ANR's decision not to classify them as such in the AOD undermines Chapter 201's purposes of promoting an even-handed, fair, and consistent system of calculating administrative penalties. The Penalty Rules establish that ANR "may consider" a violation that "continues longer than one day as a continuing violation subject to additional penalties for each day the violation continues." Exh.27, Penalty Rules § 20-105. The Penalty Rules explicitly give ANR discretion in its classification even if the violation meets the criteria by continuing longer than one day, as do the statutory penalty factors. 10 V.S.A. § 8010(c)(1) ("*if* the Secretary determines that a violation is continuing, the Secretary *may* assess a penalty . . .") (emphasis added).

ANR exercised the discretion afforded to it when it decided not to classify the wetland violations as continuing based on the factual circumstances, factors such as whether Respondent's actions had discrete endpoints, whether there was measurable or discernable additional harm on each consecutive day, and whether ANR interacted with Respondent during the period in question. SOMF ¶ 13. ANR decided not to classify the discharge violation as continuing because it found that the penalty in the AOD was sufficient to carry out the purposes of 10 V.S.A. § 8001 without additional daily penalties along with other factors. SOMF ¶ 18. While CLF objects to these factors for being "new and different," it acknowledges the absence of any guidance as to how ANR should be deciding the classification question. It is undisputed that these approaches are consistent with the approach ANR has taken in other enforcement matters. SOMF ¶¶ 13, 18.

The AOD only fails if it is insufficient to carry out the purposes of Chapter 201. CLF objects to the way ANR exercised its discretion on the separate penalty and continuing violation issues but does not challenge the discretion itself nor provide sufficient evidence that ANR's decisions are not even-handed, fair, or consistent with previous AODs.

*Economic Benefit*

CLF also seeks to prove that the AOD is insufficient for failure to implement the Chapter 201 purpose of preventing unfair economic advantage. 10 V.S.A § 8001(2). ANR must consider the economic benefit that Respondent may have gained from the violations to the extent necessary to ensure the AOD sufficiently executes this purpose of Chapter 201. It is up to ANR to decide, however, whether it is necessary to specifically increase the penalty amount in the AOD in order to do so. See 10 V.S.A. § 8010(c)(2) ("In addition to any penalty assessed . . . the Secretary may also recapture economic benefit resulting from a violation" up to the statutory maximum). For these violations, ANR found it unnecessary to adjust the penalty for the purpose of recapturing economic benefit because it determined that the costs of complying with the AOD will outweigh any economic benefit Respondent received.

CLF's argument that ANR did not perform an accurate economic benefit calculation does not withstand the evidence supporting the ANR's conclusion that the full costs imposed by the AOD will be greater than Respondent's economic benefit. For the discharge violation, Respondent did not receive economic benefit from the unpermitted discharge and did not save money by failing to address the discharge sooner. SOMF ¶ 27. If anything, Respondent incurred costs by having to make structural improvements to eliminate the discharge. SOMF ¶ 26. Respondent received some economic benefit from the sale of timber and use of additional acres of cropland on a two to three acre site associated with the Panton Road Wetland violation, though it was minimal due to the small size of the area. SOMF ¶¶ 3, 20, 21. Considering the substantial cost of restoring and monitoring the wetland in addition to the $21,750 penalty, ANR reasonably found that the terms of the AOD outweigh any economic benefit Respondent could have received from the violations. Respondent confirmed this conclusion, stating that the costs of remediating the wetland violations "will dramatically outweigh any minor economic benefit" received from the violations. SOMF ¶ 21. CLF has not shown a preponderance of the evidence that the AOD is insufficient to prevent unfair economic advantage.

*Mitigating Circumstances*

Lastly, CLF challenges ANR's decision to mitigate the penalty for an unreasonable delay in enforcement of the wetland violations. CLF argues that ANR should not have reduced the penalty by 25% because the delay was not unreasonable. The determination as to the reasonableness of the delay and the appropriate mitigation is a matter of discretion. ANR is required to consider the presence of mitigating circumstances such as unreasonable delay, 10 V.S.A. § 8010(b)(2), and "may" decide to reduce the penalty amount because of them. Exh. 27, Penalty Rules, § 20 – 302(e)(1).

ANR discovered the Panton Road Wetland violation in May 2016 and the Pease Road Wetland violation in June 2017. SOMF ¶ 24. It issued a NOAV for both in July 2017 but did not initiate a formal enforcement action until April 2020. Id. Some of the time between the NOAV and the formal enforcement can be attributed to ANR's decision in the fall of 2017 to allow additional time to complete restoration so Respondent could harvest crops. Id. In the spring of 2018, however, ANR did not make further attempts at delivery or enforcement after the registered mail it sent to Respondent was returned. Id. ANR consequently had no communication with Respondent for the two years between spring 2018 and spring 2020. SOMF ¶¶ 24, 25. This delay comes after ANR had already given Respondent time to voluntarily comply by extending the deadline in fall 2017, and after two years had already passed since the discovery of the first violation in spring 2016.

ANR acted within its discretion when it determined that its delay in pursuing enforcement for the wetland violations warranted mitigation, and its determination is reasonably supported by the stipulated facts. More importantly to the scope of review, the Court has reviewed the mitigated penalty under the purposes of Chapter 201 in each of the previous sections by virtue of reviewing the AOD and has not found it to be insufficient. CLF has not established that the mitigation made the AOD insufficient to carry out the purposes of Chapter 201.

## Conclusion

For the foregoing reasons, the Court does not find that the penalty amount in the Assurance of Discontinuance is insufficient to carry out the purposes of the Administrative

22

Environmental Law Enforcement statutes in Chapter 201. The Court accordingly **DENIES** CLF's motion for summary judgment and enters judgment in favor of ANR. ANR's motion to strike CLF's Reply is **DENIED**.

The Assurance of Discontinuance, signed by Respondent on September 21, 2020, and filed with the Superior Court, Environmental Division, on November 19, 2020, is hereby entered as an order of this Court, pursuant to 10 V.S.A. § 8007(c).

Electronically Signed: 12/10/2021 1:56 PM pursuant to V.R.E.F. 9(d).

Thomas G. Walsh, Judge
Superior Court, Environmental Division